DAVID E. HEASLEY AND KATHLEEN HEASLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Heasley v. Commissioner
Docket No. 46147-86
United States Tax Court
T.C. Memo 1988-408; 1988 Tax Ct. Memo LEXIS 436; 55 T.C.M. (CCH) 1748; T.C.M. (RIA) 88408; August 31, 1988; As amended September 6, 1988 John D. Copeland and Andrea Winters, for the petitioners. [Text Deleted By Court Emendation] Richard J. Wood, for the respondent. GERBER
MEMORANDUM FINDINGS *438 OF FACT AND OPINION GERBER, Judge: Respondent, in a statutory notice of deficiency dated September 2, 1986, determined deficiencies and additions to petitioners' income taxes as follows: Additions to the Tax
Section
Section
Section
Year
Deficiency
6653(a) [1]
6659
6661
1980
$ 7,257.00
$ 362.85
$ 2,177.10
--
1981
7,369.00
* 368.45
2,210.70
--
1983
8,435.00
* 421.75
1,553.10
$ 325.80 [2]
The issues in this case involve petitioners' lease of energy management devices from O. *439 E.C. Leasing Corporation (OEC). [3] Because petitioners have conceded the correctness of the income portion of the deficiency, the remaining issues are whether petitioners are liable for the additions to tax for negligence, section 6653(a), overvaluation, section 6659, and substantial understatement, section 6661. In addition, we must decide whether petitioners are liable for the increased rate of interest on tax motivated transactions under section 6621(c), I.R.C. 1986. FINDINGS OF FACT Petitioners, David E. and Kathleen Heasley, were married and resided in Cedar Hill, Texas, when the petition was filed in this case. The stipulated facts and exhibits are incorporated by this reference. In 1983, the Heasleys were both employed to provide a living for their family. Mr. Heasley was a welder employed by Gardner-Denver Company, a company involved in building drilling rigs and other heavy *440 equipment for the oil and gas industry. He lost his job in June 1984 as a result of the decline in the oil and gas industry in northern Texas. After being laid off, in early 1985 he started his own welding business. In 1983, Mrs. Heasley was employed as a supervisor in a plant that manufactured cheerleaders' uniforms. Mrs. Heasley finished the eleventh grade, and Mr. Heasley finished through part of the eleventh. The Heasleys were married when they left high school, and at the time of trial had been married for 24 years. Mrs. Heasley, following her marriage and the commencement of her family, received a G.E.D. certificate, the equivalent of a high school diploma. She also took several college courses in business administration--introduction to business, accounting, computer science and business law, among others. During 1980 or 1981, petitioners were introduced to a financial consultant named Gaylen Danner (Danner). From the time they first met Danner until late 1983, he visited petitioners' home several times attempting to sell them life insurance or mutual funds. Danner represented to petitioners that he had been successful in recommending profitable investments to *441 other clients in mutual funds, insurance, and buying and selling houses. He had business cards which showed him as an economic consultant and a registered representative of a securities brokerage firm. Although initially petitioners did not buy insurance or mutual funds from Danner, they became friendly with him and believed that he had expertise in the field of financial affairs. In December 1983, Danner approached the Heasleys with an investment in an energy conservation program (OEC). Because she was busy with preparations for Christmas, and it was near her birthday, Mrs. Heasley did not want to meet with him when he first approached her. She did consent to meet with Danner after Christmas, and they did meet on a number of occasions to discuss the OEC program between Christmas and New Year. Danner explained the program to the Heasleys in their home and told them it would provide them with substantial income. Danner used promotional materials provided by OEC in "selling" the program. After numerous and lengthy meetings, Danner convinced the Heasleys that they should invest $ 10,000 in the OEC program and that they should do so before the end of the year. The Heasleys *442 did not read the entire set of offering materials, although they did read portions of it in a cursory manner. Danner pointed out relevant portions to them. Mrs. Heasley paid particular attention to cash flow projections attached to an exhibit in the promotional materials. These projections took into account tax benefits of the program, including the investment tax credit. She also looked at a diagram describing the program, which was included in the promotional materials. Included was a chart entitled "Tax Advantages For Investors In 50% Bracket," showing $ 7,000 of net cash benefit from an initial $ 5,000 investment. The flow chart diagram describing the program is reproduced in Appendix A. Danner told the Heasleys about the pass-through of the investment tax credit and explained that this was similar to taking the investment tax credit on a leased car, and that these techniques were used by big businesses. He also explained the other tax aspects of the transactions to the Heasleys, and showed them portions of the tax opinion, but they did not read it all. To them, his explanations seemed logical. They believed in Danner as a friend and advisor and believed he would not *443 sell them anything improper. Petitioners made no independent investigation into the value of the energy management devices. They relied solely upon the literature and statements of Danner in making their OEC investment. Petitioners were aware of the projected tax benefits when making the OEC investment. They counted on the tax benefits to recoup their initial investment for advanced rentals and other expenses. Mr. Heasley signed the closing documents and paid the initial $ 10,000 for the systems on December 31, 1983. Danner had completed the closing documents in advance, and the Heasleys did not go over the details. Mr. Heasley signed a document indicating his net worth was over $ 150,000, but he did not completely understand the meaning of the term "net worth." Danner made assurances that the form was accurate and Mr. Heasley took his word for it. Danner advised petitioners to establish the energy savings business with a business name and business bank account. Consequently, they filed an assumed business name in the Dallas County Assumed Name Records and paid a $ 3 filing fee. They also opened a bank account in the name of D & K Electronics. Except for the initial *444 $ 10,000 investment and the assumed name filing fee, all receipts and disbursements relating to the OEC program went through the D & K Electronics account. Petitioners did not have $ 10,000 to invest in the program and Danner convinced them to borrow the money. Mrs. Heasley borrowed small amounts from various loan or consumer finance companies. The Heasleys owned two rental houses that Danner suggested could be sold or mortgaged to raise the additional money. On January 31, 1984, petitioners borrowed $ 16,000 secured by a second lien on one of the rental houses, receiving $ 15,622 net after closing costs. This amount was deposited in the D & K Electronics account and used to pay off the smaller loans. Because the investment tax credit generated by the OEC transaction was greater than the Heasleys' 1983 tax liability, it was necessary to carryback the unused credits. The Heasleys did not know how to accomplish this, so Danner introduced them to A. E. Smith (Smith), a certified public accountant. Smith prepared petitioners' 1983 return and Form 1045, Application For Tentative Carry Back of Credits. On petitioners' 1983 tax return, the advanced rentals were inexplicably denominated *445 as management fees. Petitioners claimed a $ 10,000 deduction for advanced rentals/management fees and a $ 20,000 investment tax credit related to the 1983 OEC transaction. [4]
Petitioners received from OEC or from one of the installation and service companies documents which indicated that their units had been placed in service at end users' locations, along with photographs of the units. They received statements or invoices from Temperature Technology, Inc., for installation and service charges, invoices from OEC for insurance premiums, and other expenses, which petitioners were paying as late as November 27, 1984. They believed that the units were actually in place and in service in 1984. Petitioners became concerned when they did not start receiving income from the units and corresponded with the company to try and find out why they were not receiving any income. Petitioners never received any income from either EMS II unit. In 1984, after investing in the OEC transaction *446 and before realizing it was an economic failure, Danner persuaded the Heasleys to invest $ 3,000 in a Colorado ski condominium which has similarly produced no return. In addition, they gave him $ 100 purportedly for stock in a business venture, and a $ 10,000 certificate of deposit [5] which Danner used as collateral for one of his business loans. They have never received any of their funds back for the stock or the certificate of deposit and consider both a total loss. The mechanics of the OEC transaction are identical in most respects to the transactions described in Soriano v. Commissioner,90 T.C. 44 (1988). Briefly, it involved the purchase by OEC of devices to save energy in industrial and commercial facilities. These would be leased to investors, who in turn were to have them installed and serviced (by an unrelated service company) in the facility of a third-party end user. Any energy savings would be split by the investor and the end user, with a percentage of savings retained by the service company *447 as service fees and OEC as rental payments. The energy savings would be retained by the participants in the following percentages: End-User: 50 percent Service Company: 7.5 percent Lessor (OEC): 31.88 percent Lessee (Heasleys): 10.62 percent
The end user was not required to make any other payments in connection with their use of the devices. The investor would also pay initial amounts for the first year's rental and an installation charge. The investor/lessees were purportedly entitled to tax deductions for advanced rental and installation charges, and investment tax credits, under section 48(d), based on the purchase price OEC paid for the units. The units themselves are electronic devices designed to regulate oil, gas, steam and electrical usage, thereby conserving energy to the end user. There are a number of such devices on the market. The cost of such a system is based upon its capabilities and the number of functions it can perform. Respondent's expert's report [6] explains these factors in a clear and concise manner and we quote from it below: EXPLANATION OF ENERGY MANAGEMENT SYSTEM TERMS a. Number of points. A point is a physical device in the building *448 which operates an actuator or starter or measures a temperature, status or similar parameter. The number of points a system can control or monitor is the most fundamental characteristic of a system for it establishes the system size. More points translates to more control, larger buildings and larger savings. Typical points for a system are: on-off control of a fan motor starter on-off control of a pump motor starter on-off control of a lighting contractor status input of a fire alarm status input of a fan failure temperature measurement of the outdoor air temperature measurement of the space. b. Functions performed. The functional capability of a system defines the extent to which the system can conserve energy and perform other tasks. Typical capabilities of systems include: Duty cycling: periodically switch equipment off for short periods of time Time-of-day: switch equipment on/off on a scheduled basis using the calendar, day of week or time of day Demand limiting: switch equipment off for short periods in order to avoid excessive (peak) electrical usage Temperature compensation: duty cycling and demand limiting can be enhanced by compensating *449 for room temperatures Record keeping: maintaining data on utility or temperature measurements Optimum start-stop: using measured outdoor and indoor temperatures to determine the optimum equipment start-up or shutdown Remote access: interface to the EMS by telephone using a terminal and modem Enthalpy optimization: controlling outdoor dampers on air handling units to minimize cooling Load prediction: anticipate cycling of loads and its effect on electrical demand Low level user programming [sic]: allow for the user to define a few unique sentences using an internal language Simple building security: monitor alarms on a secondary basis and notify appropriate terminals Custom applications: special sequences established to control large equipment such as chillers and boilers Maintenance management: provide equipment database, work orders, manning reports and other related reports Full HVAC [Heating Ventilation Air Conditioning] control (Direct Digital Control (DDC)): closed loop control using a sensor and analog output to maintain temperatures Full Fire and Security: approved primary monitoring of fire and security sensors Higher level programming: Fortran, *450 Basic or other higher level language programming. c. User Interface. The user interface impacts the ease with which the user can program the above functions and monitor the results. The types of interface are: LED [7] with Keypad: The most basic user interface is a keypad with the digits 0-9 and a few other function keys and a two to six digit LED display. Often with such an interface LED point lights are used to indicate on-off status or indicate the next programming operation to take place. ASCII terminal: An ASCII terminal is a standard computer terminal with a QWERTY keyboard and CRT display or hardcopy display. This type of interface typically allows for prompting for program inputs and simple reports. Multi-terminals: This type of system allows more than one person to be using the system at a time. For example, one person may be checking the status of equipment and the other may be changing schedules. Colorgraphics terminals: A colorgraphics terminal displays equipment schematically with realtime temperatures and status in appropriate locations. *451 The salient features of the EMS II (1983 model) are tabulated below: EMS II
Points:
16
Functions:
Duty cycling
Time-of-day
Demand limiting
Temperature monitoring
Remote access
Interface:
LED w/keypad
Designated
$ 100,000
Cost:
Cost per Point:
$ 6,250
The average cost per point for a random sampling of small units (4-125 points) is $ 305; medium units (50-750 points) averaged $ 230; large custom (500-2000 + points) units vary from $ 500 to $ 1,200 per point. [8] In the general market place, the most expensive units were $ 8,213 (small) and $ 20,000 (medium). Large units must be custom built and may cost $ 50,000 or more. A unit comparable to the EMS II could have been purchased for about $ 4,800 in 1983. The fair market value of the EMS II (1983 model) is $ 4,800. The ultimate profitability of the venture to OEC and its lessees was dependent upon a number of factors, including the initial advanced rental and installation expenditures, annual energy bill, actual cost savings to the *452 end user, the rate of inflation for energy costs, and useful physical and economic life of the equipment. The advanced rental for an EMS II was $ 5,000 per unit, while installation was $ 1,750. The minimum size annual energy bills which would justify use of the EMS II was $ 30,000. Based on a 1982 Department of Energy (DOE) report, energy costs were forecast to increase, on the average, 3.8 percent (electricity -- 2.0 percent, gas -- 9.1 percent, oil -- 4.3 percent). This is a weighted average for the typical industrial/commercial fuel combination. Considering a 6.2 percent inflation rate, the annual rate of energy cost increase would be 10 percent. DOE reports for earlier periods had projected cost increases of some 20 percent. Actual energy savings to a particular end user may vary significantly, depending on physical characteristics of the facility and energy conservation measures which may already have been taken. Industry reports predicted 5 to 12-percent savings with a maximum of approximately 20 percent. Actual savings are often less than projected. We agree with respondent's expert that 10 percent is a reasonable assumption. We must also evaluate the useful physical *453 and economic life of the devices. Optimistic estimates of the engineering useful life of these units is 20 to 25 years. Engineering or physical useful life is the length of time the unit may remain operational with normal repairs. The units in question were warranted for only 1 year. Electronic equipment is also subject to obsolescence (economic useful life); while the unit is still operative, it may nonetheless be more cost-effective to replace it with newer, more efficient technology. These units are also subject to obsolescence or failure of the underlying climate control units (central heating or air conditioning units). When these are replaced the new units often incorporate internal energy management control systems. Thus, we conclude, as did respondent's expert, that these devices have a useful life of approximately 10 years. Using these assumptions, one can obtain projected cash flows for the lease of an EMS II unit. Discounting this future cash flow to present value, to take into account the time value of money, is a way we have used to measured the economic viability of these transactions. See Soriano v. Commissioner, supra. The discount rate *454 reflects the risk of the venture and expected return. The prime rate in 1983 was approximately 11 percent. This is a considerably riskier venture due to chances of equipment failure, energy cost variability and failure to achieve expected savings. Twenty percent would be a minimum rate of return. In the industry, these systems are expected to pay back in 1 to 3 years, an approximate 30 percent return. Using the 20 percent rate, the discounted cash flow from the lease of an EMS II, consisting of anticipated payments from end users less advanced rental and installation fees, is a negative $ 2,788, as computed by respondent's expert. [9] Thus, the lease of a unit is not an economically viable transaction. *455 OPINION Petitioners concede that they are not entitled to the deductions and credits claimed related to the OEC transaction. The only issues remaining for our consideration involve the additions to tax and additional interest relating to petitioners' lease of energy management devices from OEC. The burden of proof is on petitioners to show they are not liable for these additions. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioners' main argument is that they are atypical tax shelter investors--unsophisticated, blue collar working people who were taken in by a shifty promoter. While that may be true, we find that petitioners' reliance does not provide a basis for finding that the additions to tax are not applicable. Section 6653(a) Addition to Tax for Negligence
The first issue we must address is the addition to tax under section 6653(a) for negligence. That section provides an addition to tax equal to 5 percent of the underpayment if any part of any underpayment is due to negligence, plus half of the interest on the underpayment (for 1981 and 1983 only) attributable to such negligence. *456 Petitioners bear the burden of proving that they were not negligent. Bixby v. Commissioner,58 T.C. 757 (1972); Enoch v. Commissioner,57 T.C. 781 (1972). Negligence, within the meaning of section 6653, is the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967), cert. denied 389 U.S. 1044 (1968); Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners argue that in making this "reasonable person" determination, we should consider the level of sophistication of the individual taxpayers, citing Schwartz Corp. v. Commissioner,60 T.C. 728 (1973). Petitioners contend that we should take into account their inexperience and level of sophistication which would render their actions reasonable. They also argue that they reasonably relied on advice of experts (Danner and Smith), thereby avoiding liability for the additions. See Hill v. Commissioner,63 T.C. 225 (1974), affd. without opinion *457 sub nom. Tenner v. Commissioner,551 F.2d 313 (9th Cir. 1977); Nelson v. Commissioner,19 T.C. 575 (1952); Lane v. United States,535 F. Supp. 397 (S.D. Miss. 1981). Although petitioners may have relied completely on others, that does not make their actions reasonable, especially under the circumstances of this case. See United States v. Boyle,469 U.S. 241 (1985). Even assuming a lower level of scrutiny for unsophisticated taxpayers, petitioners have failed to show that they were not negligent. We find it particularly relevant that petitioners did no outside investigation of the OEC program. Petitioners were investing substantial amounts in transactions involving assets purportedly valued at $ 200,000. We cannot treat this transaction in the same manner as a purchase of shares of stock listed on an exchange. This was to be a personal business venture where petitioners would be, to some extent, business operators or active participants. Still, they relied solely on materials provided by the promoter, most of which they did not read thoroughly. They did not obtain independent appraisals or other reviews. *458 See Beck v. Commissioner,85 T.C. 557 (1985); Elliott v. Commissioner,84 T.C. 227 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Fox v. Commissioner,80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Kratsa v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984). Petitioners did not go to any source other than Danner. While the cases cited above dealt with profit motive (or the lack of it), we think the failure to obtain some outside information or assistance is relevant under *459 these circumstances to whether petitioners acted reasonably. Petitioners did not read the offering materials in their entirety. While petitioners may not understand a complex tax opinion, they did not thoroughly review the other materials or seek technical assistance regarding the nontax aspects of this investment in which Danner and Smith were not versed. Petitioners knew almost nothing about the energy management business. They had attended one seminar on residential energy savings devices, and that was not in connection with this investment. Petitioners argue they based their decision on the advice of experts Danner and Smith. Even assuming Danner and Smith were experts in the fields of investment counseling and/or tax return preparation, they were not and apparently did not purport to be experts in the energy management area. We have rejected pleas of reliance when neither the taxpayer nor the "expert" relied upon knew anything about the business. Beck v. Commissioner, supra;Flower v. Commissioner,800 T.C. 914 (1983). Petitioners also argue that it would have been economically unfeasible to obtain a $ 500 or $ 600 outside analysis *460 for this "small" $ 10,000 investment. We have some trouble, in a relative sense, characterizing a cash investment equaling approximately 20 percent of petitioners' gross income as "small." Petitioners placed a second mortgage on one of their "rent houses" to fund the investment. In addition, if the transaction operated as promoted, the immediate $ 20,000 return generated by the investment tax credits was large in relation to the investment. Moreover, if the projected income did materialize, the amounts paid for any outside analysis would clearly be justified. Petitioners' position contains both paradox and contradiction. The relative size of the transaction may be viewed from another perspective. While the initial investment may have been small, petitioners were purportedly investing in equipment worth $ 200,000. This value, in turn, was the value upon which the amount of the claimed investment tax credits was based. Petitioners were aware of the tax benefits, including the investment tax credit, when they invested. They understood the pass-through provision, which they analogized to investment credits on a leased automobile. They depended on the credits for the return *461 of moneys initially invested. The value of the equipment was essential to claim tax credits. Petitioners exhibited a lack of care in claiming this amount on their return without some verification of the value. Petitioners claimed and received income tax refunds that were double the amount of the first year's prepaid rental. We cannot ignore the extraordinary substanceless inflation of the claimed value of the units (20 times fair market value) and we hold that petitioners should have been cognizant of this and taken more care. Soriano v. Commissioner,90 T.C. 44 (1988). Section 6659 Addition to Tax for Valuation Overstatements
Next, we consider the addition to tax determined for valuation overstatements. Section 6659 provides for an addition to tax equal to 30 percent of the underpayment of tax attributable to an overvaluation of more than 250 percent. Sec. 6659(a), (b). The underpayment attributable to the valuation overstatement must be at least $ 1,000. Sec. 6659(d). There is a valuation overstatement if the fair market value (or adjusted basis) of property *462 claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). One hundred thousand dollars, the value of each of the EMS units claimed on the return, is substantially more than 150 percent of $ 4,800 (the correct value of each of the EMS units), resulting in a valuation overstatement. Indeed, the value claimed for each unit exceeds 250 percent of the correct amount. The disallowed tax credits for 1983 will result in underpayments of at least $ 1,000. Thus, section 6659 is applicable to the disallowed credits. Petitioners presented no evidence concerning the value of the units. We determined the fair market value of each of these units to be $ 4,800 in 1983 based upon any person's ability to purchases similar ones in the open retail market place. Petitioners argue that the addition should not apply because the understatement was not "attributable to" a valuation overstatement. There were a number of reasons in the notice of deficiency for disallowing the credits, including, among others, that petitioners did not have a profit objective, that the EMS units were not qualifying property, that they were not placed in service, *463 and that the units were overvalued. Because petitioners conceded the deficiency, they argue that it is impossible to determine the reason for any understatement. In some cases, we have held that deductions for prepaid rentals and interest expense did not create understatements attributable to valuation overstatements. Soriano v. Commissioner, supra;Zirker v. Commissioner,87 T.C. 970 (1986). Additionally, credits disallowed because property had not been placed in service did not create understatements attributable to a valuation overstatement. Todd v. Commissioner,89 T.C. 912 (1987). Section 6659 is not applicable merely because an underpayment involves a deduction or item which is connected to a transaction involving a valuation overstatement. Petitioners do not automatically avoid imposition of this addition to tax merely by conceding the underlying deficiency. Petitioners bear the burden of showing this addition does not apply. Rule 142(a). Moreover, the above cited cases, where the deductions did not depend on valuation, are distinguishable. The interest and rent expenses in Soriano and Zirker, as opposed to the *464 investment credits and depreciation deductions, did not involve claiming the adjusted basis or value of property on a return. In addition, in Todd we make specific findings that the deductions and credits were disallowed because the property had not been placed in service. In the instant case we made specific findings as to value due to the tax credit issue, but other issues were substantively unrelated. The allowance of the investment credit to a lessee is dependent upon the value of property. Sec. 48(d). Thus, to the extent the underpayment is due to the disallowed credits, the underpayment is attributable to a valuation overstatement. See Zirker v. Commissioner, supra at 979; Soriano v. Commissioner, supra.
Petitioners next argue that respondent should have waived the addition, under section 6659(e), because they have shown good faith and a reasonable basis for the valuation. Although there is no legislative history to be found for the waiver provision of section 6659(e), there is somewhat analogous legislative history to help explain similar language found in section 6700(b)(2). S. Rept. No. 97-494 (1982), p. 267, states as follows: *465 The Secretary is given authority to waive all or part of any penalty resulting from a gross valuation overstatement, upon a showing that there was a reasonable basis for the valuation and the valuation was made in good faith. The mere existence of an appraisal is not sufficient, by itself, to show either reasonable basis or good faith. Rather, the Secretary may, for example, examine the basis for the appraisal, the manner in which it was obtained, and the appraiser's relationship to the investment or promoter.
In any event, petitioners have not shown a reasonable basis for the valuation of the EMS units. We have found that petitioners were negligent, within the meaning of section 6653(a), in relying solely on information provided by OEC and/or Danner in preparing their income tax returns. Similarly, there was no reasonable basis for the valuation claimed on the return. [10]
*466 Section 6659 is applicable to returns filed after December 31, 1981. There are credit carrybacks attributable to the OEC transaction to 1980 and 1981. [11] In Nielsen v. Commissioner,87 T.C. 779 (1986), we held that "an item carried back from a later year to an earlier year, is 'attributable to' the adjustment in the later year." The carryback is not less than $ 1,000 for either of the carryback years. Thus, the addition to tax also applies as to the credits carried back to 1980 and 1981. Section 6661 Addition to Tax for Substantial Understatements
Respondent determined a section 6661 addition for substantial understatement of tax liability regarding the portion of the deficiency not related to the valuation overstatement. Section 6661 does not apply to that portion of the understatement attributable to a valuation overstatement. [12]Sec. 6661(b)(3). Section 6661(c) is similar to section *467 6659(e), in that respondent is permitted to waive the addition if the taxpayer shows reasonable cause and good faith regarding the understatement. The advanced rental deductions exceeded the normal purchase price of similar property. Therefore, as in the section 6659 addition situation, we find that there was no reasonable basis for petitioners' substantial understatement of their income tax liability. Section 8002(b) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, 100 Stat. 1874, 1951, increased to 25 percent the addition for substantial understatement, effective for additions assessed after October 21, 1986. Because the addition will be assessed after that date, the 25 percent rate applies. Pallottini v. Commissioner,90 T.C. 498 (1988). Section 6621(c) Additional *468 Interest on Tax Motivated Transactions
The final issue is the interest imposed on tax motivated transactions imposed by section 6621(c). [13]The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). A tax motivated transaction includes any valuation overstatement, as defined in section 6659. Sec. 6621(c)(3)(A)(i). The underpayment attributable to the transaction must exceed $ 1,000. [14] Thus, with respect to the underpayments attributable to the disallowed credits, the increased rate of interest applies. Sec. 6621(c)(1). We must next decide *469 whether the increased rate of interest applies to the disallowed advanced rental and other expenses. The claimed advanced rental payment deductions are not valuation overstatements. Soriano v. Commissioner,90 T.C. 44, 61-62 (1988). The Commissioner has the authority to specify other types of transactions that will be treated as tax motivated. Sec. 6621(c)(3)(B). Deductions disallowed for any period under section 183 relating to an activity not engaged in for profit are included in respondent's temporary regulations, sec. 301.6621-2T Q-4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984). See Patin v. Commissioner,88 T.C. 1086 (1987). Petitioners conceded that the credits and deductions were correctly disallowed by respondent. There were a number of grounds for disallowance. However, there is ample evidence in the record to indicate that the leasing activity was not engaged in with a bona fide profit objective. In Soriano v. Commissioner, supra, we analyzed the same type of transaction, involving the same lessor, OEC, and essentially the same terms. In that case we sustained the Commissioner's *470 disallowance of deductions and credits based on a lack of profit objective. Rather than repeat our discussion in the Soriano case, we will list the subjective and objective [15] factors, supported by specific findings in this record, indicating that petitioners lacked the requisite profit objectives: (1) Without tax considerations, the discounted cash flow from the transaction would be negative--the investment tax credit is not a substitute for or component of economic profit, Friendship Dairies, Inc. v. Commissioner,90 T.C. 1054 (1988); (2) there would be wide variability in energy savings based on factors not in petitioner's control, including rate of savings and energy prices; (3) petitioners did not obtain independent appraisals or reports, nor did they do any outside investigation--see Beck v. Commissioner,85 T.C. 557, 577 (1985); (4) the first year's advanced rental exceeded the fair market value of the entire system; and (5) the units did not generate any income for petitioners--see section 1.183-2(b)(6), (7), Income Tax Regs. We are aware that petitioners made numerous inquiries when the systems were not returning the projected income. *471 However, this one factor in their favor is outweighed by numerous other facts with contrary implications. Also, petitioners repeat their unsophisticated investor argument, and maintain that they entered into this transaction to produce income without considering tax benefits. Petitioners were aware of the tax benefits when they entered into the transaction and, by their own testimony, depended on the investment credits for return of the initial investment. Thus, the OEC program was a tax motivated transaction within the meaning of section 6621(c) and the additional interest applies. To reflect the foregoing, Decision will be entered for the respondent.
APPENDIX A ILLUSTRATION OF INVESTOR'S INVOLVEMENT
[SEE ILLUSTRATION IN ORIGINAL] Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
*. Plus 50 percent of the interest on the deficiencies ↩
2. This amount was increased to $ 814.50 pursuant to this Court's order dated Nov. 3, 1987, granting respondent permission to amend his answer to claim the increased amount, pursuant to section 8002(b) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951, which increased the section 6661↩ addition from 10 percent to 25 percent of a substantial understatement. 3. This case involves the same leases of energy management devices as were at issue in Soriano v. Commissioner,90 T.C. 44↩ (1988). However, in this action petitioners seek to show only that respondent erred with respect to the additions to tax. 4. Two units at $ 5,000 per unit equals $ 10,000 advance rental deduction. Two units at $ 100,000 per unit times 10 percent equals $ 20,000 investment tax credit. See secs. 162, 46(a)(2)(B) and 48(d). ↩
5. This was purchased with proceeds from the OEC venture and was originally intended to repay the loans taken out to participate in the OEC program. ↩
6. The reports of respondent's experts in this case and in Soriano↩ are similar, and in many respects are identical. 7. Light emitting diode. This is apparently similar to the red or green on black display on a calculator.↩
8. We use figures provided in respondent's expert's report. Costs are list price using 20 units (small) and 5 units (medium). ↩
9. We will briefly explain the methodology used by respondent's expert in reaching his conclusions. Discounted cash flow equals lessee's discounted percentage of energy savings minus advanced rental and installation expenses. The starting point for total energy savings is the minimum annual bill. This is projected into the future using the anticipated energy inflation rate, i.e. $ 30,000 x 10 percent = $ 33,000 -- the energy bill for year 2; $ 33,000 x 10 percent = $ 36,300 -- the energy bill for year 3, and so on. The energy savings rate is then applied to each year's annual energy bill, resulting in total projected energy savings. The lessee is entitled to 10.62 percent of this figure. The lessee's portion of savings is then discounted to present value using a 20-percent rate of return. The projection is extended for 10 years into the future, the anticipated useful life of the machines. Because the rate of return is built-in to the discount rate, any discounted cash flow greater than or equal to zero produces an economic profit. ↩
10. A valuation exceeding 20 times the actual fair market value of an asset seems inherently unreasonable. As respondent correctly points out, the "valuations" provided by OEC ignored the fact that there was a competitive market for such devices. Because there was no reasonable basis for the valuation, we do not reach respondent's argument that his discretion under sec. 6659(e)↩ is not reviewable by this or another Court. 11. The 1980 return would have been timely filed on or before Apr. 15, 1981. ↩
12. Respondent determined that $ 5,177 of the $ 8,435 deficiency for 1983 was attributable to a valuation overstatement, leaving $ 3,258 (the portion attributable to the disallowed advanced rental deductions) as the substantial understatement to which section 6661↩ is applicable. 13. Prior to the Tax Reform Act of 1986, subsec. (c) was designated subsec. (d). Sec. 1511(a), Pub. L. 99-514, 100 Stat. 2085, 2744. The additional interest applies only after Dec. 31, 1984, notwithstanding that the transaction was entered into prior to that date. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005↩ (2d Cir. 1986). 14. We previously found this with respect to the sec. 6659↩ issue. 15. We have used objective factors in determining profit objective. Rose v. Commissioner,88 T.C. 386↩ (1987).